# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# PEORIA DIVISION

Joshua and Rachel Allen, Kyle                )
and Julie Campbell,Shana                     )
Severinsen, David Peterson,                  )
Daniel and Kelly Messmore,                   )
Christopher and Kimberly Woods,              )        Case No: 14-CV-1224
William A Bulfer, Shawn F. Miller,           )
Martin and Tammi Lyons, Jason                )        Judge James E. Shadid
M. Cassidy, Helen M. Elliott,                )
Brandon and Michele Beekman,                 )        Magistrate Judge
William R and Lee Ann Meyers,                )        Jonathan E. Hawley
Michael and Kellie Beamer, David             )
and Courtney Stenger,  Myron L               )
Smith, Michael and Julie Sowers,             )        Tazewell County Case
David and Patti Boggs, Robert L              )        No. 2014-CH-81
Cornelius, Jr.,Tegist and Mark               )
Leyew,  Pamela & Harry Volk,                 )
Randy Rundle, Delbert & Julie                )
Chilton, Robert H Jorgensen,                 )
Jeanie Inman, Robert Stasz, and              )
Stephen and Dawn Hageman,                    )
                                             )
            Plaintiffs,                       )
                                             )
      v.                                      )
                                             )
CITY OF EAST PEORIA, a municipal             )
corporation,   David Mingus,                 )
Gary Densberger, Dan Decker                  )
Timothy Jeffers and Chad Joos                )
Tom Brimberry, Robert Cole,                  )
Tony Griffin, Steve Minner,                  )

1

| | |
|---|---|
| Mark Piquard, Steve Ferguson, | ) |
| Rick Semonski, Patrick Meyer, | ) |
| Patrick N. Meyer & Associates, | ) |
| Midwest Engineering Associates, | ) |
| Inc., David Horton, Phillip J. | ) |
| Lane, Robert D. Culp, Charles | ) |
| F. Dobbelaire, Jeffery D. | ) |
| Geibelhausen Stephen D. Carr, | ) |
| Ronald Combs, Ronald E. Drain | ) |
| and Marion F. McGrew Clark | ) |
| Engineers MW, Inc., Earl S | ) |
| Moldovan, Charles A. Brun, | ) |
| and Raymond J. Perison Harry | ) |
| M. LaHood and Joseph D. LaHood, | ) |
| Each in his individual capacity, | ) |
| | ) |
| Defendants. | ) |

## **FIRST AMENDED COMPLAINT**

Plaintiffs, through counsel, MEYER & KISS, LLC and CARL REARDON, allege:

1.    This is an action to remedy violations of civil rights brought pursuant to 42 U.S.C. § 1983, including the taking or damaging of property without due process of law in violation of the Fifth and Fourteenth Amendments    of the United States Constitution and §§ 2 and 15 of Article I of the Illi  nois Constitution.  The Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, attorney's fees and costs, and all other relief this Court deems just and proper.

## **JURISDICTION AND VENUE**

2.    Jurisdiction for Plaintiffs' federal claims is based on 28 U.S.C. §§ 1331and 1343(a).  Jurisdiction for Plaintiffs' state claims is based on 28 U.S.C. Section 1367(a).  Venue is proper in this Court pursuant to 28 U.S.C. §   1391(b) in that the claims arose in this district as alleged below.

**PARTIES**

3.    The following Plaintiffs are the owners of real property located in Pinecrest Hills Subdivision Section 2 (hereinafter referred to as "Pinecrest #2)located in the City of East Peoria, Tazewell County, Illinois 61611:

|   |   |
|---|---|
| a. | Kyle and Julie Campbell, 112 Kaitlin |
| b. | Shana Severinsen, 116 Kaitlin |
| c. | Joshua and Rachel Allen, 120 Kaitlin |
| d. | David Peterson, 220 Sunnybrook Drive |
| e. | Daniel and Kelly Messmore, 101 Kaitlin |
| f. | Christopher M. and Kimberly A. Woods, 104 Kaitlin |
| g. | William A Bulfer, 105 Kaitlin |
| h. | Shawn F. Miller, 108 Kaitlin |
| i. | Martin and Tammi Lyons, 109 Kaitlin |
| j. | Jason M. Cassidy, 113 Kaitlin |
| k. | Helen M. Elliott, 117 Kaitlin |
| l. | Brandon and Michele Beekman, 121 Kaitlin |
| m. | William R and Lee Ann Meyers, 124 Kaitlin |
| n. | Michael and Kellie Beamer, 100 Kaitlin |
| o. | David C and Courtney Stenger, 107 Sunnybrook |
| p. | Myron L Smith, 205 Sunnybrook |
| q. | Michael P and Julie A Sowers, 213 Sunnybrook |
| r. | David & Patti Boggs, 221 Sunnybrook |
| s. | Robert L Cornelius, Jr., 112 Sunnybrook |
| t. | Tegist and Mark Leyew, 116 Sunnybrook |
| u. | Pamela & Harry Volk, 201 Sunnybrook |
| v. | Randy Rundle, 200 Sunnybrook |
| w. | Delbert & Julie Chilton, 208 Sunnybrook |
| x. | Robert H Jorgensen, 212 Sunnybrook |
| y. | Jeanie Inman, 216 Sunnybrook |
| z. | Robert Stasz, 224 Sunnybrook |

4.    The following Plaintiffs are the owners of real property located in Dobbelaire Hills Subdivision Section 2 (hereinafter referred to as "Dobbelaire #2) located in the City of East Peoria, Tazewell County, Illinois 61611:

Stephen and Dawn Hageman, 701 Kerfoot Street

5.     The Defendants are:

a.     City of East Peoria (hereinafter referred to as "City"), a political subdivision of the State of Illinois, located in Tazewell County;

b.     David Mingus is the duly elected and sworn Mayor of the City. At all times relevant to this complaint, he was acting in the course and scope of his office, and under color of state law, Code of Ordinances and/or regulations; each defendant is being sued in his individual capacity;

c.     Gary Densberger, Dan Decker, Timothy Jeffers and Chad Joos are duly elected and sworn City Commissioners and members of the City Council. At all times relevant to this complaint, they were acting in the course and scope of their office, and under color of state law, Code of Ordinances and/or regulations; each defendant is being sued in his individual capacity;

d.     Tom Brimberry, Robert Cole, Tony Griffin, Steve Minner, Mark Piquard, Steve Ferguson, Rick Semonski, Patrick Meyer, Patrick N. Meyer & Associates, Midwest Engineering Associates, Inc., David Horton, Phillip J. Lane, and Robert D. Culp, are duly appointed and sworn officers of the City. At all times relevant to this complaint, they were acting in the course and scope of their office, and under color of state law, Code of Ordinances and/or regulations; each defendant is being sued in his individual capacity;

e.     Charles F. Dobbelaire and Jeffery D. Geibelhausen were duly elected and sworn City Commissioners, members of the City Council and Mayors. At all times relevant to this complaint, they were acting in the course and scope of their office, and under color of state law, Code of Ordinances and/or regulations; each defendant is being sued in his individual capacity;

4

f.      Stephen D. Carr, Ronald Combs, Ronald E. Drain and Marion F. McGrew Clark Engineers MW, Inc., Earl S Moldovan, Charles A. Brun, and Raymond J. Perison were duly appointed and sworn officers of the City. At all times relevant to this complaint, they were acting in the course and scope of their office, and under color of state law, Code of Ordinances and/or regulations; each defendant is being sued in his individual capacity;

g.      Harry M. LaHood and Joseph D. LaHood were subdivision developers, and LaHood Construction, Inc. was a subdivision contractor and home builder doing business in the City; each defendant is being sued in his individual capacity.

## **FACTS**
### **BACK IN THE 1970'S WHEN DOBBELAIRE #2 WAS DEVELOPED**

6.      On or about the 5th day of January, 1970, Cyriel A. Dobbelaire developed Dobbelaire # 2.  At that time, he dedicated the right-of-way for the extension of Kerfoot Street (hereinafter referred to as "Kerfoot") as well as easements for, among other things, water lines and sanitary sewer lines.  He also dedicated a 20-foot wide drainage easement across lots 37 and

7.      The City accepted the dedications described above, including the 20-foot wide drainage easement across lots 37 and 38 more than 40 years ago.

8.      Hagemans have owned Lot 38 of Dobbelaire #2 for more than 20 years.

9.      The amount of storm water running across the drainage easement and across the Hageman property has increased substantially since 1970 because of a substantial amount of subsequent nearby subdivision development.

10.     The storm water drainage system owned by the City that drains along Kerfoot and across Hageman's property has deteriorated so much that it has become obsolete, defective and ineffective.  As a result, Hageman's     property has been flooded repeatedly.  Their home has been inundated     with flood water and a substantial amount of their land has eroded away.

11.     The flooding across Plaintiffs' property at 701 Kerfoot has created a stagnant pond in the ravine behind their property that has caused hordes of mosquitoes to germinate and pester them, thereby preventing the Hageman family from enjoying themselves outside their home.

**BACK IN 1990 WHEN PINECREST HILLS #2 WAS DEVELOPED**

12.     Section 6.1.8 of the East Peoria Subdivision Code states "…any land deemed to be topographically unsuitable shall not be subdivided for residential purposes."

13.     On February 5, 1990, a Preliminary Subdivision Plat for Pinecrest #2 was submitted by Harry and Joseph LaHood to the City of East Peoria (hereinafter referred to as the "City").

14.     The Preliminary Plat referred to above shows four drainage easements (each 20 feet wide) proposed for Pinecrest Hills #2.

15.     On February 22, 1990, a request for rezoning from Conservation to R-2 Single Family Dwelling for Pinecrest #2 was submitted by Harry and Joseph LaHood to the City.

16.     On March 20, 1990, the City adopted Ordinance No. 2411, an ordinance changing the zoning classification of the aforesaid Pinecrest #2 from   Conservation to R-2 Single Family Residential.

17.     On March 20, 1990, the Preliminary Subdivision Plat of Pinecrest #2 was approved by the City increasing the length of Kaitlin by 168 feet and increasing the number of homes that could be built on this 10.40 acres from 25 to 29.

18.     On September 18, 1990, the City adopted Ordinance No. 2421 approving the Final Plat of Pinecrest #2.

19.     Kaitlin ended up being 168 feet longer than originally planned.  This extension allowed the developers to add 4 additional lots than was originally planned.  Part of these 4 lots were created by hauling in fill dirt.

6

20. The Final Plat included, among other things, the following laguage: "Sanitary and storm sewer easements as shown hereon are reserved for the City of East Peoria, Illinois and there is hereby granted said City the perpetual easement and authority to enter upon said easements to construct and maintain within the easements, sewers and manholes, together with connections thereto." The plat is signed by Harry and Joseph LaHood, and their signatures are notarized by Diane Kay Lauterbach on the 9th day of June, 1990.

21. The aforesaid Final Plat also shows on its face, among other things, at least four 20 foot wide drainage easements dedicated by Harry and Joseph LaHood, developers of Pinecrest #2, to the City.

22. The aforesaid Final Plat was recorded by the City in the office of the Tazewell County Recorder of Deeds on October 4, 1990.

23. The lot numbers on the Preliminary Plat differ from the lot numbers on the Final Plat because of the four lots that were added between the time the subdivision was started and when it was finished.

## EASEMENT BY PRESCRIPTION

24. The aforesaid Preliminary Plat and Final Plat also show a 20-foot wide dedicated drainage easement owned by the City in the adjacent Dobbelaire #2 subdivision that simply stops at the edges of lots 22 and 23 of Pinecrest #2. This is the same easement that traverses the Hageman property. Even though the aforesaid dedicated easement stops at the edge of Pinecrest #2, the water that drains from Dobbelaire #2 onto Pinecrest #2 does not stop.

25. For more than 23 years, the drainage water from Dobbelaire #2 has crossed over onto Pinecrest #2 without a dedicated easement, thereby creating an easement by prescription in favor of the City. The amount of this water flowing through this easement has increased substantially over the years.

26. The ravine into which the water flows thru the aforesaid easement by prescription owned by the City is located directly behind lot 24 (owned by Robert Jorgensen, 212 Sunnybrook)), lot 25 (owned by Jeanie Inman, 216 Sunnybrook),

7

lot 26 (owned by David Peterson, 220 Sunnybrook), and lots 27 and 28 (owned by Robert Stasz) 224 Sunnybrook in Pinecrest Hills.

## DISASTER STRUCK ON OR ABOUT APRIL 17, 2013

27.     On or about April 17, 2013, all of the Plaintiffs were residents of either Kaitlin Court (hereinafter referred to as "Kaitlin") or Sunnybrook Drive (hereinafter referred to as "Sunnybrook") in Pinecrest # 2 (hereinafter referred to as "Pinecrest Hills").

28.     Disaster struck on or about April 17-18, 2013; three separate landslides rendered four homes in Pinecrest #2 (three homes on Kaitlin and one home on Sunnybrook) uninhabitable and threatened others that adjoined these homes.

29.     Three of the houses are next to each other on Kaitlin. They are:  112 Kaitlin owned by Kyle and Julie Campbell; 116 Kaitlin owned by Shana Severinsen; and 120 Kaitlin owned by Joshua Allen and Rachael Allen.

30.     The fourth house a block away at 220 Sunnybrook is owned by David Peterson.

31.     House #1 ( Allen) had the smallest landslide; it ran under the garage footing leaving the house in jeopardy of the garage collapsing, and possibly the rest of the house then sliding down the hill. This house sustained the most immediate damage.

32.     The left side of 120 Kaitlin (Allen) and the right side of the 124 Kaitlin yard (Meyers) were loose silt and sand fill dirt that slipped off the old earth and slid down the ravine;

33.     Houses #2 & #3 (Campbell at 112 Kaitlin & Severinsen at 116 Kaitlin) had one large land slide and was the most photographed and publicized. It has become the poster child for extensive local and national print, radio and TV news coverage.

34.     Most of the back yard behind 116 Kaitlin (Severinsen) was loose fill dirt, and it slipped off the old earth and slid down the ravine; this left some dirt holding back the footings of 116 Kaitlin.

35.     The back yard of 112 Kaitlin (Campbell) slid sideways into the Severinsen yard and this dirt then slipped down the ravine behind 116 Kaitlin. The Campbell's property is the least damaged, but was still declared uninhabitable and a nuisance by the City.

36.     Engineers for the City said that all of the Kaitlin properties should be fixed as one project, probably with one continuous retaining wall.  They also indicated that these houses cannot be repaired and the back yards of these properties cannot be restored unless and until the storm drainage systems are repaired.

37.     House #4 owned by David Peterson is at 220 Sunnybrook, about 500 feet from away from the houses on Kaitlin, and is on a different ravine. Their back yard also slid down the ravine, but the ravine is much deeper. The Peterson back yard looks like 116 Kaitlin, except it has more dirt left holding the footings than does 116 Kaitlin.

38.     House # 4 owned by David Peterson (220 Sunnybrook) was declared to be uninhabitable and a nuisance by the City. The Peterson family was required to vacate the premises and has never been allowed to return.

39.     The rear of Lot #25 owned by Jeanie Inman (216 Sunnybrook) that is adjacent to the Peterson property is eroding and part of the foundation of the Inman patio is sagging. It is in danger of a landslide if a resolution is not obtained.

40.     The rear of Lot #27 (224 Sunnybrook owned by Robert Stasz) adjacent to the Peterson property is eroding.  It is in danger of a landslide if a resolution is not obtained.

41.     The current Engineers for the City said that all three Sunnybrook properties should be fixed as one project, probably with one continuous retaining wall.  They also indicated that the back yards of all of these properties cannot be fixed unless and until the storm drainage system is repaired.

**THE ROLE OF CLARK ENGINEERS MW, INC**

42.     Back in 1990, Clark Engineers MW, Inc. (hereinafter referred to as "Clark") served as the engineers for Harry and Joseph LaHood, developers of Pinecrest Hills.   Clark also served as engineers for the City.

43.     The elevations specified on the engineering plans for Kaitlin prepared by Clark appear to be incorrect, especially when considering the drop in elevation from the front of the properties (Street Level) to the rear of the properties (at the bottom of the ravine where the dedicated drainage easement is located).  For example: The original drop in elevation on Lot #38 (Severinsen – 116 Kaitlin) is quoted on the engineering plan as 8 feet. It is actually more like 64 feet (according to the topo maps on the City's website).  On paper the slopes are minimal and show no cause for concern. In actuality they are treacherous.

44.     Clark planned that the 20 foot wide easement dedicated to the City in the ravine behind the homes on the east side of Kaitlin would function as a storm drain. This would drain the water on Kaitlin down to another creek that ran north of Sunnybrook.

45.     Clark planned the ravine behind the homes on the east side of Kaitlin so that it originated behind the first lot. It originally was designed to drop about 14-16 feet in elevation behind the first few lots on the east side of Kaitlin. Then the ravine was designed to slope at a minimal level all the way to the end of the subdivision.  This can be seen in the blue prints prepared by Clark. This would guarantee that water would not flow down at a steep angle and cause massive erosion. This was the original Clark design.  However, this is not how it was built.

46.     The back yards of lots 30, 31, 32, 33, 35, 36 of Pinecrest #2 were filled in to level their back yards (with a 2 foot downhill grade). This essentially filled in the ravine and gave these lots nice flat back yards. The remaining drop in elevation of approximately 18 feet occurred in a short distance in the ravine at the rear of the Campbell and Severinsen lots. This caused water to flow at a tremendous speed down a steep dirt slope causing severe erosion. During the storm on April 17, 2013, this high speed water eroded out the base of the rear of Campbell's property, causing the Campbell back yard to drop about 3 feet, and this water continued on and washed out the stream bed retaining walls behind Severinsen.

47.     The stream bed in the ravine behind the Severinsen house was reinforced by heavy wood reinforced with steel retaining walls, some of which washed out and ended downstream about 100 feet. The retaining walls that did not wash out are buried under several feet of debris and they are not visible. These retaining walls were not mentioned in the engineering report prepared for the City.

48.     The back yard landfill stopped at Lot #37 (property of Kyle & Julie Campbell). Lot 37 was supposed to have a 4 foot drop in elevation (one foot for every 20 feet) in the ravine across its 80 foot-wide backyard. However, since the other lots (30, 31, 32, 33, 35, and 36 of Pinecrest #2) were filled in, this 4 foot drop now became a drop of about 18 feet.

49.     There were no special accommodations planned for steep fast moving water, just a dirt trough to channel a steep waterfall. The Clark plan called for a 24-inch wide grass capped graded channel to hold this water. A gentle slope would ensure longevity and regular maintenance by the City would allow it to survive. However, this is not how it was built. The storm water channel was very steep and no rip rap rock was provided. And the City did not ever maintain or repair its 20 foot wide drainage easement for the next 23 years.

## A DRAINAGE PIPE TO HELP STOP EROSION WAS PROVIDED BY THE CITY

50.     A storm drainage pipe ran along a dedicated 20 foot wide drainage easement on the west side of Sunnybrook between lots 30 and 31 of Sunnybrook down to the ravine behind Kaitlin.  This drainage pipe and easement off of Sunnybrook connected to the 20 foot wide dedicated easement behind Kaitlin at approximately a 90 degree angle.

51.     This 90 degree connection caused so much erosion to the Kaitlin back yards from time to time that the owners of the Kaitlin back yards contacted the City about the situation.  One of the City's engineers inspected the problem and told the owners of Lots 35 and 36 that it was not the City's problem because the City did not own the drainage easement and did not have any responsibility to repair or maintain said easement.

52.     However, even though the City claimed that it did not have any responsibility to repair or maintain said easements, it nevertheless provided Plaintiffs with a solution.  It "donated", among other things, a plastic drainage pipe approxi-

11

mately 80-100 foot long.  This drainage pipe was to be connected to a concrete catch basin.

53.	The drainage pipe off of Sunnybrook was also to be connected to the same concrete catch basin easement behind Kaitlin at a 90 degree angle.  This solution failed to work.  Water eroded the soil around the concrete catch basin so that much of the water failed to run through the 80-100 foot long drainage pipe.

54.	A few years before the April 17- 18, 2013 disaster, with the help and direction of the City, the sides of the drainage easement behind 116 Kaitlin were lined with heavy wooden walls. These walls were about 24 inches high and lined the sides of the creek bed and ensured that heavy water flow would reduce the damage to the hills on both sides of the ravine, and would keep the water channeled as it flowed down the creek.

55.	These walls were not included in the original Clark design.  They were added by the property owner because of the 18 foot drop in elevation on the Campbell property (lot 38) caused the water to run too fast and the walls channeled the water down the valley floor. These were the same walls that washed out and were driven downstream even though they weighed in excess of a hundred pounds each.

56.	Inspection of the ravine in March of 2013 before the April 17 disaster revealed that the ravine behind 116 Kaitlin was very steep, estimated to be at an angle of 45-60 degrees. It was so steep one could barely walk up the side of the ravine. One would need to find a tree to grab onto to help pull oneself up each step of the hill. The trees were mature and were about 8-10 inch trunks. The hill was supported by vegetation and no signs of extensive erosion were evident at that time.

57.	At the bottom of the hill of lot 38 (116 Kaitlin owned by Severinsen) there was a drainage area. This was in the City's 20 foot wide storm drainage easement. The drainage area behind Lot 38 showed evidence of erosion. It was about 23 years old. However, the 80-100 foot drainage pipe at the other end of Kaitlin where it connected at the 90 degree angle with the drainage pipe from Sunnybrook had eroded excessively.

58.     After the April 17-18, 2013 landslides, the entire bottom of the ravine had debris about 10 feet high piled upon it, along with uprooted trees. Some of the heavy wooden walls that held the creek to its banks downstream had washed behind the Allen residence at 120 Kaitlin (lot 39 of Pinecrest #2).

59.     The rest of the walls are buried somewhere under the debris field. The heavy wooden walls washed out during the storm. The top of the hill of Lot #38 (Severinsen) remained intact, but rode down the hill. The flat grass backyard was now about 40 feet lower and was now at the bottom of the ravine.

60.     Examination of the damaged back yard revealed two more clues. There were the remains of two tree trunks still intact behind the house on lot #38 (Severinsen). The base of these tree trunks were about 18 feet below the street level, and the base of these tree trunks were about 45 feet above the creek bed.

61.     The plans that the City reviewed and approved showed that the slopes behind Lot #38 (Severinsen) were not dangerous as the drop in elevation from street level to valley floor was only 8 feet over a distance of 115 feet (a one-foot drop every 14 feet). However, according to the City's TOPO maps, the elevations had a 64 foot drop.  Lot #38 (Severinsen) had lots of sandy fill dirt placed on very steep slopes.

62.     The property next door to lot 38 (lot 37 – Campbell residence) also had lots of land fill. Their back yard (near the ravine) was full of concrete slabs. The original storm drainage area called for a 24 inch wide grass path, but this area became severely eroded.

63.     During the April 17, 2013 storm, the back and back left corner of the lot 37 (Campbell) collapsed as it was full of concrete slabs. This caused their back yard to drop about 2 feet. This drop, along with the collapse in their back yard, caused the City concern and it also evacuated that house. This property continued to collapse with additional rain and its garage foundation is threatened.

64.     There is a storm drain between Severinsen and Allen that comes off of Kaitlin at the curb. According to the original Clark design, it was supposed to drain the entire Kaitlin street storm water downhill through a metal 12 inch pipe dropping 8

13

feet in elevation and emptying into a ditch check at the creek level behind lot #38 (Severinsen).

65.    The "As Built" -4A plan by Clark shows that the storm drain referred to above was actually cut short, not going all the way down the hill, but stopping a few feet short of the creek.

66.    However, it actually drops about 64 feet in elevation, and the pipe is not metal, but plastic, and it dumped onto the hill behind Lot 38 about 10 feet above the creek; and no ditch check exists, just a big eroded hole on the hill. After the hill collapsed the plastic pipe tore in two and now it erodes the land below the Severinsen footings.

67.    Kaitlin storm water from the street now dumps directly behind the house on Lot 38 (Severinsen). The City was notified about this storm pipe break about 2 weeks after the April 17-18, 2013 disaster, but no action was taken by the City.

68.    The families residing in the four homes were forced by the City to move out immediately on April 17, 2013 and they have never been allowed to return.

69.    On April 26, 2013, the City served each of the 4 property owners (Allen, Severinsen, Campbell and Peterson) with an official notice that their properties were in violation of City's Unsafe Buildings Ordinance.

70.    The aforesaid notice goes on to declare each of the 4 homes a nuisance and gives each owner 15 days to repair or demolish them.

71.    Signs posted on the front doors of the four homes in Pinecrest Hills for the past 17 months state, "DANGER – THIS STRUCTURE IS DECLARED UNSAFE FOR HUMAN OCCUPANCY OR USE. IT IS UNLAWFUL FOR ANY PERSON TO ENTER OR OCCUPY THIS BUILDING AFTER APRIL 19, 2013. ANY PERSON REMOVING THIS SIGN WILL BE PROSECUTED

72.    Signs posted on orange fences in the yards of four homes in Pinecrest Hills for the past 17 months state: DANGER – UNSTABLE HILLS – DO NOT ENTER – BY ORDER OF THE CITY OF EAST PEORIA.

73.    On May 7, 2013, the City denied that it had any responsibility for repairing the damage to the storm water drainage system in Pinecrest #2.

14

74.   On May 7, 2013, the City also promised to determine who owned the drainage easements in the ravines in Pinecrest #2, but the City failed to do so.

75.   The City continues to this date to deny that it has any responsibility for the maintenance and repair of the drainage easements in Pinecrest #2.

76.   For more than 23 years the City has done nothing to maintain or repair the drainage easements in Pinecrest Hills except to donate a 80-100 foot long pipe approximately 24 inches in diameter and a lid for a concrete catch basin to help collect the water running from Kaitlin to the ravine behind the homes on the east side of Kaitlin.

77.   Pinecrest Hills was designated as part of a FEMA Disaster Area by President Obama.

78.   Since April 17-18, 2013, the landslides continued to expand and encroach on neighboring properties creating ongoing emergency situations.

79.   The City of East Peoria has confirmed that the storm drainage areas in Pinecrest Hills did suffer extensive damage and that repairs are needed.

80.   On July 24, 2013, the City of East Peoria applied to IEMA (Illinois Emergency Management Agency) for alternative grants: (a) To repair the damages and restore the land area at a total cost of $398,560; or (b) Buyout the four properties and restore the land area at a total cost of $935,050.

81.   The aforesaid IEMA Application was denied because IEMA had too many requests and not enough money.

82.   The City did expend funds for engineering and legal fees as a result of the April   17-18, 2013 disaster.  However, on September 26, 2013, the City stated, among other things, as follows:  "As you know, at this point in time, the City has committed no further funds for this project."

83.   The four houses have not been repaired, the back yards have not been restored and the storm drainage systems in Pinecrest #2 have not been restored or repaired.

84.    The drainage system in Dobbelaire #2 at 701 Kerfoot has not been restored or repaired.

85.    Because of the landslides, the value of these 4 properties has been wiped out. They are totally unmarketable.  These homes are deteriorating rapidly and repairs cannot be made unless and until the City restores and maintains its drainage easements.

86.    The marketability and value of the remaining homes in Pinecrest Hills has plummeted dramatically.

87.    The neighborhood has acquired a stigma for the following reasons: (a) difficulty reselling; (b) lower resale value; (c) hidden damage; (d) dangerous for children; and (e) recurrence of landslides.

88.    In the front page story of the East Peoria Times-Courier dated Wednesday, March 12, 2014, "MAYOR GIVES STATE OF CITY ADDRESS", Mayor Dave Mingus said, among other things, that 2013 was a year of unexpected expenses due to Mother Nature. The flooding April 17-18 and the tornado November 17 caused unbudgeted expenses. Then he said, "In 2014, we're going to have to figure out how we're going to offset those expenditures. I believe there's a proposal to withdraw approximately $700,000 from the reserve fund."

89.    Mayor Mingus applauded the current and previous City Councils for having set aside money for "rainy days". "Due to the healthy reserves, the city will continue to do business as usual without any interruptions to our citizens. We are very happy in 2014 that we will be able to meet all of our budgeted and unbudgeted needs and to once again decrease our residents' property taxes."

90.    In the coming year, Mayor Mingus said the council will have to determine whether to build a new City Hall, look for opportunities to assist older established businesses, particularly extending from the Levee District. "Hopefully, a facelift in this area with ornamental lighting, parking and new signage will enhance the viability of the area," Mingus said. "We've focused heavily on the Levee District and we can never forget that the Levee District is only one portion of our town."

## COUNT I
**For Declaratory Judgment Challenging Constitutionality of Chapter 3 (Unsafe Buildings) of Title 4 of the East Peoria Code of Ordinances**

91.    Plaintiffs reallege paragraphs 1 through 90 as if fully set forth herein.

92.    Plaintiffs bring this cause of action for declaratory relief under 735 ILCS 5/2-701 against the City.

93.    On April 26, 2013, City Steve Minner, Building and Property Inspector for the City, served an "official notice" that properties owned by four of the Plaintiffs were in violation of Chapter 3 (Unsafe Buildings) of Title 4 (Building Regulations) of the East Peoria Code of Ordinances.

94.    Chapter 3 of Title 4 of East Peoria Code of Ordinances violates the Fifth and Fourteenth Amendments of the United States Constitution and Sections 2 and 15 of Article I of the Illinois Constitution.  It is illegal, unconstitutional and without force of law in the following respects, among others:

95.    It conflicts with Section 11-31-1 of the Illinois Municipal Code (65 ILCS 5/11-31-1) in violation of Article VII, Section 8 of the 1970 Illinois Constitution.

96.    Cities are regulated by provisions of Article VII, Section 8 of the 1970 Illinois Constitution which states in relevant part, these governments "*shall have only powers granted by law.*"

97.    Section 11-31-1 of the Illinois Municipal Code provides in relevant part:

"(65 ILCS 5/11-31-1) (from Ch. 24, par. 11-31-1)
 Sec. 11-31-1. Demolition, repair, enclosure, or remediation.
       (a) The corporate authorities of each municipality may demolish, repair, or enclose or cause the demolition, repair, or enclosure of dangerous and unsafe buildings . . . within the territory of the municipality . . . .
    The corporate authorities **shall apply to the circuit court** of the county in which the building is located (i) for an order authorizing action to be taken with respect to a building if the owner or owners of the building, including

17

the lien holders of record, after **at least 15 days' written notice** by mail so to do, have failed to put the building in a safe condition or to demolish it or (ii) for an order requiring the owner or owners of record to demolish, repair, or enclose the building . . . (Emphasis added).

The hearing upon the application to the circuit court shall be expedited by the court and shall be given precedence over all other suits. Any person entitled to bring an action under subsection (b) shall have the right to intervene in an action brought under this Section.

**The cost of the demolition, repair, enclosure, or removal incurred by the municipality, . . . , including court costs, attorney's fees, and other costs related to the enforcement of this Section, is recoverable from the owner or owners of the real estate . . . and is a lien on the real estate**; the lien is superior to all prior existing liens and encumbrances, except taxes, if, within 180 days after the repair, demolition, enclosure, or removal, the municipality, . . . who incurred the cost and expense shall file a notice of lien for the cost and expense incurred in the office of the recorder in the county in which the real estate is located . . . (Emphasis Added).

**The notice must consist of a sworn statement setting out (1) a description of the real estate sufficient for its identification, (2) the amount of money representing the cost and expense incurred, and (3) the date or dates when the cost and expense was incurred by the municipality . . .** Upon payment of the cost and expense by the owner of or persons interested in the property after the notice of lien has been filed, the lien shall be released by the municipality, the person in whose name the lien has been filed, or the assignee of the lien, and the release may be filed of record as in the case of filing notice of lien. Unless the lien is enforced under subsection (c), the lien may be enforced by foreclosure proceedings as in the case of mortgage foreclosures under Article XV of the Code of Civil Procedure or mechanics' lien foreclosures. An action to foreclose this lien may be commenced at any time after the date of filing of the notice of lien. The costs of foreclosure incurred by the municipality, including court costs, reasonable attorney's fees, advances to preserve the property, and other costs related to the enforcement of this subsection, plus statutory interest, are a lien on the real estate and are recoverable by the municipality from the owner or owners of the real estate." (Emphasis added).

98.     The City Code states that after 15 days the City "**may** make or cause to be made application to the Circuit Court . . .", whereas the Illinois Municipal Code states, "The corporate authorities **shall** apply to the circuit court . . . after at least 15 days' written notice."  The Illinois Municipal Code requires the 15 Day Notice to include the lien holders of record, whereas the City Code does not require notice to lienholders. If the municipal exercise of a given power is inconsistent or in conflict with a state statute, the state statute prevails.

99.     The penalty provisions of the Unsafe Buildings chapter of the East Peoria Code of Ordinances exceed the statutory authority granted to the City by the Illinois Municipal Code in violation of Article VII. Section 8 of the 1970 Illinois Constitution.

100.    65 ILCS 5/1-2-1 provides in relevant part, " The corporate authorities of each municipality may pass all ordinances and make all rules and regulations proper or necessary, to carry into effect the powers granted to municipalities, with such fines or penalties as may be deemed proper. **No fine or penalty, however, . . . shall exceed $750 . . .**"(emphasis added).

101.    The penalty provisions of the Unsafe Buildings chapter of the East Peoria City Code provide in relevant part:

> "(b) The cost (no limit is specified) of such demolition or repair shall be recoverable from the owner or owners of such real estate and shall be a lien thereon, which lien shall be superior to all prior existing liens and encumbrances, except taxes; provided, that within sixty (60) days after such cost and expense is incurred the city, or person performing the service by authority of the city, in his or its own name, shall file notice of lien in the office of the Recorder of Deeds of Tazewell County setting out:
>> (1) A description of the real estate sufficient for identification thereof; and
>> (2) The amount of money representing the cost and expense incurred or payable for the service; and
>> (3) The date or dates when the cost or expense was incurred by the city.  Such lien may be enforced by proceedings to foreclose as in the case of mortgages or mechanic's liens; but such suits must be com-

menced within three (3) years after the date of filing notice of the lien."

102.   It is obvious that costs to repair or demolish any of the properties involved in this case will easily run into the thousands, if not tens of thousands, of dollars (far in excess of the $750 limit imposed by the Illinois Municipal Code).

103.   An Illinois non-home-rule municipality is governed by Article VII, §7 of the Illinois Constitution, which provides certain basic powers concerning forms of government, officers, taxes, assessments, and debts. Beyond those powers, it has only that police power given to it by the General Assembly and possesses, therefore, no inherent power.

104.   If the municipal exercise of a given power is inconsistent or in conflict with a state statute, the state statute prevails.

105.   The Unsafe Buildings chapter of the East Peoria Code of Ordinances is void for vagueness on its face and in its application in this case and, therefore, is in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and Sections 1 and 2 of Article 1 of the Illinois Constitution.

106.   The City failed to apply to the circuit court of Tazewell County (i) for an order authorizing action to be taken with respect to a building if the owner or owners of the building, including the lien holders of record, after at least 15 days' written notice by mail so to do, have failed to put the building in a safe condition or to demolish it or (ii) for an order requiring the owner or owners of record to demolish, repair, or enclose the building.

Wherefore, Plaintiffs request that the Court enter an order:

A.   Declaring that Chapter 3 (Unsafe Buildings) of Title 4 of the East Peoria Code of Ordinances is unconstitutional;

B.   Declaring that the "official notice" served on April 26, 2013, by Steve Minner, Building and Property Inspector for the City, that properties owned by four of the Plaintiffs were in violation of Chapter 3 (Unsafe Buildings) of Title 4 (Building Regulations) of the East Peoria Code of Ordinances, is illegal and without force of law in violation of the Fifth and

Fourteenth Amendments of the United States Constitution and Sections 2 and 15 of Article I of the Illinois Constitution; that

C.  Plaintiffs be awarded attorney's fees and costs; and

D.  For such other relief as the Court may deem appropriate.


## COUNT II (42 U.S.C. § 1983)

**Inverse Condemnation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Sections 2 and 15 of Article I of the Illinois Constitution**

107.   This is an inverse condemnation action arising out of an unconstitutional taking of each of 28 Plaintiffs' properties damaged by the City of East Peoria without formal condemnation or payment of compensation.  Plaintiffs' claims are based on the prohibitions of the Fifth and Fourteenth Amendments of the U.S. Constitution and Sections 2 and 15 of the Illinois Constitution against the taking of private property without just compensation.

108.   Plaintiffs reallege paragraphs 1 through 106 as if fully set forth herein**.**

109.   Plaintiffs are the individuals who are identified in paragraphs 3 and 4 above.

110.   Defendants are the City of East Peoria, David Mingus, Gary Densberger, Dan Decker, Timothy Jeffers, Chad Joos, Tom Brimberry, Robert Cole, Tony Griffin, Steve Minner, Mark Piquard, Steve Ferguson, Rick Semonski, Patrick Meyer, Patrick N. Meyer & Associates, Midwest Engineering Associates, Inc., David Horton, Phillip J. Lane, and Robert D. Culp.

111.   On April 26, 2013, Defendant Steve Minner, Building and Property Inspector for the City served an "official notice" that the following properties were in violation of Chapter 3 (Unsafe Buildings) of Title 4 (Building Regulations) of the East Peoria Code of Ordinances:

a.      112 Kaitlin Court, East Peoria, Illinois 61611 owned by Kyle and Julie Campbell, Plaintiffs;

b.      116 Kaitlin Court, East Peoria, Illinois 61611 owned by Shana Severinsen, Plaintiff;

c.      120 Kaitlin Court, East Peoria, Illinois 61611 owned by Joshua and Rachel Allen, Plaintiffs; and

d.      220 Sunnybrook Drive, East Peoria, Illinois 61611 owned by David Peterson, Plaintiff.

112.   The aforesaid "official notice" declares each of the 4 properties mentioned above to be unsafe, a nuisance and unlawful.  Said "official notice" also required each of the plaintiffs identified in paragraph 4 above to either repair or demolish the 4 homes within 15 days.

113.   The Inspections Department of the City of East Peoria also posted notices on each of the 4 properties mentioned above that stated:  "DANGER This Structure Is Declared Unsafe For Human Occupancy or Use.  It Is Unlawful For Any Person To Enter Or Occupy This Building After April 19, 2013.  Any Unauthorized Person Removing This Sign WILL BE PROSECUTED. Date: 4/19/13."  Each of said notices continue to remain posted.

114.   Orange fences were erected on each of the 4 properties with signs that state:  DANGER   UNSTABLE HILLSIDES   DO NOT ENTER   By Order of the City of East Peoria Department of Buildings and Public Property."  Each of said fences and signs remain erected and posted.

115.   Officials of the City required all of the occupants to vacate each of the four properties referred to above on April 17, 2013, and they have never been allowed to return.

116.   The actions of the Defendants have resulted in an interference with each of the 24 Plaintiffs' use and enjoyment of their property amounting to a substantial damaging of their property without compensation in violation of the Fifth and

22

Fourteenth Amendments of the United States Constitution and Sections 2 and 15 of Article I of the Illinois Constitution.

117.   As a result of the unauthorized damaging of Plaintiffs' property, a right has accrued to each of the 24 Plaintiffs for the recovery of just compensation for the properties damaged from the date that the damage was effected, that is April 17, 2013.

118.   The sum claimed by each of the 24 Plaintiffs as just compensation for damaging of their property is that sum being the difference between the fair market value of each of the 24 properties immediately before and immediately after the City's taking as follows:

a.      Kyle and Julie Campbell, 112 Kaitlin; before:  $206,000; after: $000,000; just compensation: $206,000.

b.      Shana Severinsen, 116 Kaitlin; before: $210,000; after: $000,000; just compensation: $210,000.

c.      Joshua and Rachel Allen, 120 Kaitlin; before:  $147,210; after: $000,000; just compensation: $147,210.

d.      David Peterson, 220 Sunnybrook; before: $166,530; after: $000,000;   just compensation: $166,530.

e.      Daniel and Kelly Messmore, 101 Kaitlin; before: $170,040;   after: $36,090;   just compensation: $133,950.

f.      Christopher and Kimberly Woods, 104 Kaitlin; before: $151,980;   after: $36,390;   just compensation: $115,590.

g.      William A Bulfer, 105 Kaitlin; before: $204,450; after: $35,310; just compensation: $169,140.

h.      Shawn F. Miller, 108 Kaitlin; before: $158,000; after: $36,390; just compensation:  $121,610.

i.      Martin and Tammi Lyons, 109 Kaitlin; before: $180,759; after: $32,659; just compensation: $148,100.

j.      Jason Cassidy, 113 Kaitlin; before: $201,990; after:  $36,090; just compensation: $165,900.

k.      Helen M Elliott, 117 Kaitlin; before:  $220,350; after: $36,090; just compensation: $184,260.

l.      Brandon and Michele Beekman, 121 Kaitlin; before:  $185,070; after: $36,090;   just compensation: $148,980.

m.      William and Lee Ann Meyers, 124 Kaitlin; before: $184,500;   after: $31,390; just compensation: $153,110.

n.      Michael and Kellie Beamer, 100 Kaitlin; before: $211,080; after: $35,310; just compensation: $175,770.

o.      David and Courtney Stenger, 107 Sunnybrook; before: $206,000; after: $36,090   just compensation: $169,910.

p.      Myron L Smith, 205 Sunnybrook; before: $25,050; after: $6,262; just compensation: $18,788.

q.      Michael and Julie Sowers, 213 Sunnybrook; before:  $144,780; after: $34,680; just compensation: $110,100.

r.      David and Patti Boggs, 221 Sunnybrook; before:  $207,630; after: $36,390; just compensation: $171,240.

s.      Robert L Cornelius, Jr., 112 Sunnybrook; before: $207,660; after: $36,390; just compensation: $171,270.

t.      Tegist and Mark Leyew, 116 Sunnybrook; before: $150,630; after: $33,472; just compensation: $117,158.

u.      Pamela & Harry Volk, 120 Sunnybrook; before: $151,890; after: $33,472; just compensation: $118,418.

v.      Randy Rundle, 200 Sunnybrook; before: $133,890; after: $33,472; just compensation: $100,418.

w.      Delbert & Julie Chilton, 208 Sunnybrook; before: $224,760; after: $39,164; just compensation: $185,596.

x.      Robert H Jorgensen, 212 Sunnybrook; before: $200,820; after: $36,390; just compensation: $164,430.

y.      Jeanie Inman, 216 Sunnybrook; before: $178,470; after: $25,040; just compensation: $153,430.

z.      Robert Stasz, 224 Sunnybrook; before: $193,410;   after: $26,390; just compensation: $167,020.

Wherefore, Plaintiffs request:

A.  Judgment for each of the 28 properties owned by the Plaintiffs:

1.  Kyle and Julie Campbell in the amount of $206,000

2.  Shana Severinsen in the amount of $210,000

3.  Joshua and Rachel Allen in the amount of $147,210

4.  David Peterson in the amount of $166,530

5.  Daniel and Kelly Messmore in the amount of $133,950

6.  Christopher and Kimberly Woods in the amount of $115,590

7.  William Bulfer in the amount of $169,140

8.  Shawn Miller in the amount of $121,610

9.  Martin and Tammi Lyons in the amount of $148,100

10. Jason Cassidy in the amount of $165,900

11. Helen Elliott in the amount of $184,260

12. Brandon and Michele Beekman in the amount of $148,980

13. William and Lee Ann Meyers in the amount of $153,110

14. Michael and Kellie Beamer in the amount of $175,770

15. David and Courtney Stenger in the amount of $169,910

16. Myron Smith in the amount of $18,788

17. Michael and Julie Sowers in the amount of $110,100

18. David and Patti Boggs in the amount of $171,240

19. Robert Cornelius, Jr in the amount of $171,270

20. Tegist and Mark Leyew in the amount of $117,158

21. Pamela and Harry Volk in the amount of $118,418

22. Randy Rundle in the amount of $100,418

23. Delbert and Julie Chilton in the amount of $185,596

24. Robert Jorgensen in the amount of $164,430

25. Jeanie Inman in the amount of $153,430

26. Robert Stasz in the amount of $167,020

B. Interest at the lawful rate from the date of the taking, April 17, 2013, until judgment is paid for each of the 24 Plaintiffs;

C. Full recovery of costs and attorney's fees for each of the 24 Plaintiffs;

D. Such other and further relief as the court deems just and proper.

JURY TRIAL DEMANDED

## COUNT III (42 U.S.C. § 1983)

## Inverse Condemnation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Sections 2 and 15 of Article I of the Illinois Constitution

119.   This is an inverse condemnation action arising out of an unconstitutional taking of each of one of Plaintiffs' properties damaged by the City of East Peoria without formal condemnation or payment of compensation.  Plaintiffs' claims are based on the prohibitions of the Fifth and Fourteenth Amendments of the U.S. Constitution and Sections 2 and 15 of the Illinois Constitution against the taking of private property without just compensation.

120.   Plaintiffs reallege paragraphs 1 through 118 as if fully set forth herein.

121.   Plaintiffs, Stephen and Dawn Hageman, are individuals whose postal address is 701 Kerfoot Street, East Peoria, Illinois.

122.   Defendants are the City of East Peoria, David Mingus, Gary Densberger, Dan Decker, Timothy Jeffers, Chad Joos, Tom Brimberry, Steve Ferguson, Rick Semonski, Patrick Meyer, Patrick N. Meyer & Associates, Midwest Engineering Associates, Inc., David Horton, Phillip J. Lane, and Robert D. Culp.

123.   On or about the 5th day of January, 1970, Cyriel A. Dobbelaire developed Dobbelaire Hills Subdivision Section 2.  At that time, he dedicated the right-of-way for the extension of Kerfoot Street as well as easements for, among other things, water lines and sanitary sewer lines.  He also dedicated a 20-foot wide drainage easement across lots 37 and 38.

124.   The City accepted the dedications described above, including the 20-foot wide drainage easement across lots 37 and 38 more than 40 years ago.

125.   Plaintiffs have owned Lot 38 of Dobbelaire Hills Subdivision Section 2 for more than 20 years.

27

126.   The amount of storm water running across the aforesaid drainage easement has increased substantially since 1970 because of a substantial amount of nearby subdivision development.

127.   The storm water drainage system owned by the City that drains across Plaintiffs' property has deteriorated so much that it has become ineffective.  As a result, Plaintiffs' property has been flooded repeatedly.  Their home has been flooded and a substantial amount of their land has eroded away.

128.   The flooding across Plaintiffs' property at 701 Kerfoot Street has created a stagnant pond in the ravine behind their property that has caused hordes of mosquitoes to germinate and prevent Plaintiffs from going out of their home.

129.   The actions of the Defendants have resulted in an interference of Plaintiffs' use and enjoyment of their property amounting to a substantial damage to their property without compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Sections 2 and 15 of Article I of the Illinois Constitution.

130.   As a result of the City's unauthorized damaging of Plaintiffs' property, a right has accrued to Plaintiffs, Stephen and Dawn Hagemen, for the recovery of just compensation for the damage to their property from the date that the damage was effected, that is April 17, 2013.

131.   The sum claimed by each of Plaintiffs as just compensation for damaging their property is that sum being the difference between the fair market value of their property immediately before and immediately after the  City's taking as follows:

701 Kerfoot Street by Stephen and Dawn Hageman; before: $118,200; after: $29,080; just compensation $89,120.

Wherefore, Plaintiffs Stephen and Dawn Hageman request:

A.     Judgment in the amount of $89,120;

B.      Interest at the lawful rate from the date of the taking, April 17, 2013, until judgment is paid;

C.      Punitive damages in the amount of $100,000.

JURY TRIAL DEMANDED

## COUNT IV
## PENDANT STATE CLAIMS IN EQUITY FOR DECLARATORY JUDGMENT ( 735 ILCS 5/2-701), MANDAMUS  (ARTICLE XIV ILCS)  AND INJUNCTION ( 735 ILCS 5/11-101)

This is a proceeding in equity for Declaratory Judgment, Mandamus and Injunction.

132.   Plaintiffs reallege paragraphs 1 through 131 as if fully set forth herein.

133.   This is a controversy between Plaintiffs and the City of East Peoria that arises out of a disaster that occurred on or about April 17, 2013, at Kaitlin Court and Sunnybrook Drive in Pinecrest Hills #2 and at 701 Kerfoot Street.

134.   Plaintiffs are the individuals who are identified in paragraphs 3 and 4 above.

135.   Defendant is the City of East Peoria.

136.   Each of the Plaintiffs has a property right that should be protected by equitable relief.

137.   The City owns four 20-foot wide drainage easements that were dedicated to the City by Defendants, Harry and Joseph LaHood, on or about the 4th day of October, 1990.

138.   The City also owns at least one other drainage easement, part of which was dedicated to the City by Cyriel A Dobbelaire on or about the 5th day of January, 1970, across lot 38 (701 Kerfoot Street) in Dobbelaire Hills Subdivision Section 2

29

that is owned by Plaintiffs, Stephen M and Dawn M Hageman, and the remainder of which the City acquired by prescription over the past 20 plus years across the rear of lots 24 (owned by Plaintiff Robert Jorgensen), 25 (owned by Plaintiff Jeanie Inman), 26 (owned by Plaintiff David Peterson) and 27 (owned by Plaintiff Robert Stasz) of Pinecrest Hills #2.

139.   On April 26, 2013, the City served each of the 4 property owners (Allen, Severinsen, Campbell and Peterson) with an official notice that their properties were in violation of the City's Unsafe Buildings Ordinance. The aforesaid notice goes on to declare each of the 4 homes a nuisance and gives the owners 15 days to repair or demolish them.

140.   Signs posted on the front doors of the 4 homes in Pinecrest Hills for the past 17 months state, "DANGER – THIS STRUCTURE IS DECLARED UNSAFE FOR HUMAN OCCUPANCY OR USE. IT IS UNLAWFUL FOR ANY PERSON TO ENTER OR OCCUPY THIS BUILDING AFTER APRIL 19, 2013. ANY PERSON REMOVING THIS SIGN WILL BE PROSECUTED."

141.   Signs posted on orange fences in the yards of 4 homes in Pinecrest Hills for the past 17 months state: DANGER – UNSTABLE HILLS – DO NOT ENTER – BY OR-DER OF THE CITY OF EAST PEORIA.

142.   On May 7, 2013, the City denied that it had any responsibility for repairing the damage to the storm water drainage system in Pinecrest Hills #2.

143.   On May 7, 2013, the City also promised to determine who had ownership interests in the drainage easements in the ravines in Pinecrest Hills #2.

144.   Shortly after disaster on April 17, 2013, Plaintiffs requested that the City acknowledge its ownership of the drainage easements described above, which ownership the City refused to acknowledge.

145.   Prior to and also subsequent to April 17, 2013,  Plaintiffs requested that theCity inspect, repair and maintain the aforesaid storm drainage systems, and the City failed and refused to do.

146.   At all relevant times referred to herein, it was the duty of the City to inspect, maintain and repair its storm drainage systems in Pinecrest Hills # 2 and Dobbelaire Hills # 2.

147.   Plaintiffs have an interest in and a clear right to the performance of the City's duty because they own and reside in real property adjacent to the aforesaid storm drainage systems.

148.   As a result of the City's failure and refusal to act, Plaintiffs have been injured in the following respects:

149.   Each of the four homes and the back yards of the 4 homes declared by the City to be unsafe and a nuisance cannot be repaired and restored unless and until the City first repairs its drainage easements.

150.   A stigma is attached to all of the homes in Pinecrest Hills.  The homes have decreased in value by at least 50%.  87% of the people surveyed said that if they were in the market to purchase a home, they would not consider purchasing one in Pinecrest Hills.  More than 50% of the people surveyed indicated they would expect at least a 50% discount if they would consider purchasing a home in Pinecrest Hills.

151.   Beginning on or about April 17-18, 2013, and continuing to the present time, City wrongfully and unlawfully engaged in a course of conduct designed to deprive, deny, interfere with, exercise control over, and damage Plaintiffs' property interests:

      A.   By failing and refusing to restore, repair and maintain the storm drainage systems in Pinecrest Hills over which the City has ownership and control;

      B.   By causing a stigma to attach to all of the homes of all of the Plaintiffs by announcing on May 7, 2013 that it was not responsible for making repairs and that it would not be willing to use taxpayer money to make repairs.

31

C.   Each of the four homes and the back yards of the 4 homes declared by the City to be unsafe and a nuisance cannot be repaired and restored unless and until the City first repairs its drainage easements.

D.  By failing to restore and repair the backyards of those Plaintiffs that were damaged.

152.   A stigma is now attached to the homes of all Plaintiffs.  The homes have decreased in value by at least 50%.  Of the people surveyed, 87% said that if they were in the market to purchase a home, they would not consider purchasing one in Pinecrest Hills.  More than 50% of the people surveyed indicated they would expect at least a 50% discount if they would consider purchasing a home in Pinecrest Hills.

153.   The City continues to this date to deny that it has any responsibility for the maintenance and repair of the drainage easements described above.

154.   The wrongful conduct of the City, unless restrained and enjoined by an order of this Court, will continue to cause great and irreparable harm to Plaintiffs, in that:

a.      The City's presence and activities on the property interfered and continue to interfere with Plaintiffs' quiet enjoyment of the property, and caused and continue to cause Plaintiffs great emotional stress;

b.      The City's refusal to restore and repair its storm drainage systems contained on its own drainage easements prevents each of the four Plaintiffs, who the City evacuated, from restoring their backyards and repairing and either re-occupying, renting or selling their homes;

c.      The City's actions or failure to act has caused each of the four Plaintiffs who the City evacuated to default on their mortgages and to face foreclosure and bankruptcy;

d.    The City's actions or failure to act has caused a danger to children in the neighborhood;

e.    The City's actions or failure to act has caused the homes of all of the Plaintiffs to be worth substantially less and unmarketable;

f.    Plaintiffs have no adequate remedy at law for the injuries Plaintiffs have suffered and will continue to suffer in the future unless the City's wrongful conduct is restrained and enjoined.

Wherefore, Plaintiffs request that the Court enter an order:

A.    Declaring that the City is the owner of the drainage easements described above;

B.    Declaring that the City has the responsibility to repair and maintain the drainage easements described above;

C.    Mandating that the City acknowledge it is the owner of the storm water drainage easements described above;

D.    Mandating that the City immediately take measures to restore, repair and maintain its storm water drainage easements;

E.    Mandating that the City immediately take measures to restore the backyards of those Plaintiffs that have been damaged.
F.    Mandating that the City arrange to have all utilities that were ordered disconnected by the City to be re-connected.

G.    Mandating that the City pay for the damages to the homes of those Plaintiffs that have been damaged; and that

H.    Plaintiffs be awarded attorney's fees and costs and for such other relief as the Court may deem appropriate.

33

## COUNT V (42 U.S.C. § 1983)
## DAMAGES TO REAL ESTATE - CIVIL CONSPIRACY

155.   This is a claim for damages to real estate resulting from a civil conspiracy to cover-up construction defects in in Pinecrest Hills Subdivision Section 2.

156.   Plaintiffs are the individuals who are identified in paragraphs 3 and 4 above.

157.   Defendants are the City of East Peoria, Harry M. LaHood, Joseph D. LaHood, LaHood Construction, Inc., Clark Engineers MW, Inc., Earl S Moldovan, Charles A. Brun, Raymond J. Perison, Stephen D. Carr, Dan Giebelhausen, Ronald Combs, Ronald E. Drain, Marion F. McGrew, Jeffery D. Giebelhausen, and Charles F. Dobbelaire.

158.   Plaintiffs reallege paragraphs 1 through 154 as if fully set forth herein.

159.   That on or about April 17, 2013, and at all other times herein mentioned, Plaintiffs were the owners of the following described real estate located in Pinecrest Hills in the City of East Peoria, Tazewell County, Illinois identified in paragraphs 3 and 4 above.

160.   Defendants, Harry M LaHood and Joseph D LaHood, were partners engaged in the business of acquiring real estate and developing subdivisions.

161.   Defendant, LaHood Construction, Inc., was engaged in, among other things, the business of constructing subdivisions and also constructing homes in subdivisions.

162.   Defendant, Clark Engineers MW, Inc., was engaged in, among other things, the business of providing civil engineering services to municipalities and also to subdividers.  One of Clark's municipal clients was the City of East Peoria.  Clark's private clients included Defendants, Harry M LaHood and Joseph D LaHood, and Defendant, LaHood Construction, Inc.

34

163.    Defendants, Earl S. Moldovan, Charles A Brun and Raymond J Perison, were employees of Clark Engineers MW, Inc., and Moldovan was also one of its principal shareholders.

164.    Defendants, City of East Peoria, Stephen D. Carr (Director of Public Works), Dan Giebelhausen, (Superintendent of Operations), Ronald Combs (Building Inspector), Ronald E. Drain (Zoning Administrator), Marion F. McGrew (City Engineer), and Jeffery D. Giebelhausen (Commissioner of Streets and Public Improvements)

165.    Prior to 1978, Cyriel A. Dobbelaire developed two subdivisions known as Dobbelaire Hills Subdivision Section 1 and Dobbelaire Hills Subdivision Section 2. His son, Defendant Charles Dobbelaire, served the City of East Peoria from 1975 to 2007 (as Commissioner for 24 years and as Mayor for 8 years).  He also worked with his father in the family business.

166.    On or about September 26, 1978, Cyriel Dobbelaire obtained approval by the City for Dobbelaire Hills Subdivision Section 3.

167.    On or about the latter part of 1989 or early 1990, Defendants ,  Harry M LaHood and Joseph D LaHood, entered into an agreement with Cyriel Dobbelaire to purchase Dobbelaire Hills Section 3, with the plan to rename it and to  develop it as Pinecrest Hills Subdivision Section 1.

168.    In the spring of 1990, Defendants, Harry M LaHood and Joseph D LaHood, entered into an agreement to purchase additional property from Cyriel Dobbelaire with the plan to subdivide and develop it as Pinecrest Hills Subdivision Section 2.  The properties owned by the plaintiffs are located in this subdivision.

169.    There were one or more agreements between two or more of the defendants who knowingly and voluntarily participated in one or more of the following unlawful acts of willful or wanton misconduct in furtherance of the agreement:

> a.    Rezoning from C-Conservation District to R-2 One Family Dwelling District    contrary to East Peoria Comprehensive Plan;

b.      Violations of the East Peoria Subdivision Code:

1. Section 6-1-8 (A) Suitability of Land For Subdivision.  Parts of the  land were topographically unsuitable for subdividing;

2. Section 6-1-8 (B) Development of parts of the subdivision were detrimental to the best interests of the public;

3. Section 6-1-10 Violation of subparagraph C which requires dedication for public use of at least 15 feet in width on both sides of a drainage course;

4. Failure to comply with Ordinance 1730 (development within subdivisions);

5. Failure to comply with Section 6-2-6 (City Engineer duty and responsibility);

6. Failure to comply with Section 6-2-1 (D) 5 (failure to approve intended dedications);

7. Failure to comply with Section 6-2-3 (approved plat without compliance with design standards and specifications;

8. Failure to comply with Section 6-2-6 (Engineering and In-spection);

9. Failure to comply with Section 6-3-1 (I) (erosion control sys-tem);

10. Failure to comply with Section 6-3-2 (A) 2 (runoff of storm water);

11. Failure to comply with Section 6-3-5 (inspection);

12. Failure to comply with Section 6-3-6 (B) (Certification by City Engineer);

13. Failure to comply with Section 6-3-7 (Approval by City Engineer);

c.      Failure to comply with Sections 5-14-1 thru 5-14-9 (Benching and Terracing Ordinance);

d.      False site grading plan dated 5/17/1990 and revised 6/22/1990 submitted by Clark Engineers MW, Inc.;

e.      False storm sewer "as built" plans dated 11/14/90 submitted by Clark Engineers MW, Inc.;

f.      Commissioner Charles Dobbelaire voted in favor of Ordinance 2453 (changing zoning from Conservation to R-2 in Pinecrest Hills Subdivision Section 2) on 7/17/90.

g.      Commissioner Charles Dobbelaire voted in favor of Ordinance 2421    (approving final plat of Pinecrest Hills Subdivision Section 2) on 9/18/90.

h.      Extension of Kaitlin Court by 168 feet by hauling in large quantities of fill dirt from off-site by truck creating four additional lots.

170.   The above acts in furtherance of the conspiracy, including the the extent of the use of the fill dirt, were unknown to the Plaintiffs and was not discoverable until after the April 2013 disaster.

171.   Injuries were caused by unlawful overt acts performed by one or more of the defendants that deprived, denied, interfered with, and damaged Plaintiffs' property interests:

a.      Development of a substandard subdivision with substandard drainage systems;

b.      Development of a substandard subdivision prone to earth set-tlement and landslides;

172.   As a result of one or more unlawful overt acts, the plaintiffs were injured as follows:

a.      A stigma is attached to all of the homes in Pinecrest Hills;

b.      The homes have decreased in value by at least 75%;

c.      87% of the people surveyed said that if they were in the market to purchase a home, they would not consider purchasing one in Pinecrest Hills.

173.   That by one or more of said actions or omissions, Plaintiffs have suffered damage to their property interest in that:

a.      Their homes have become unmarketable;

b.      Their homes have decreased in value by at least the following amounts:

1.Kyle and Julie Campbell, 112 Kaitlin; before: $206,000; after: $000,000;

2. Shana Severinsen, 116 Kaitlin; before: $210,000; after: $000,000;

3. Joshua and Rachel Allen, 120 Kaitlin; before:  $147,210; after:   $000,000;

4. David Peterson, 220 Sunnybrook; before: $166,530; after: $000,000;

5. Daniel and Kelly Messmore, 101 Kaitlin; before: $170,040; after:  $36,090;

6. Christopher and Kimberly Woods, 104 Kaitlin; before: $151,980;   after: $36,390;

7. William A Bulfer, 105 Kaitlin; before: $204,450; after: $35,310;

8. Shawn F. Miller, 108 Kaitlin; before: $158,000; after: $36,390;

9. Martin and Tammi Lyons, 109 Kaitlin; before: $180,759; after: $32,659;

10. Jason Cassidy, 113 Kaitlin; before: $201,990; after: $36,090;

11. Helen M Elliott, 117 Kaitlin; before:  $220,350; after: $36,090;

12. Brandon and Michele Beekman, 121Kaitlin; before: $185,070; after: $36,090;

13. William and Lee Ann Meyers, 124 Kaitlin; before: $184,500; after: $31,390;

14. Michael and Kellie Beamer, 100 Kaitlin; before: $211,080; after: $35,310;

15. David and Courtney Stenger, 107 Sunnybrook; before: $206,000; after: $36,090;

16. Myron L Smith, 205 Sunnybrook; before: $25,050; after: $6,262;

17. Michael and Julie Sowers, 213 Sunnybrook; before: $144,780; after: $34,680;

18. David and Patti Boggs, 221 Sunnybrook; before:  $207,630; after: $36,390;

19. Robert L Cornelius, Jr., 112 Sunnybrook; before: $207,660; after:  $36,390;

20. Tegist and Mark Leyew, 116 Sunnybrook; before: $150,630; after: $33,472;

21. Pamela & Harry Volk, 120 Sunnybrook; before: $151,890; after: $33,472;

22. Randy Rundle, 200 Sunnybrook; before: $133,890; after: $33,472;

23. Delbert & Julie Chilton, 208 Sunnybrook; before: $224,760; after: $39,164;

24. Robert H Jorgensen, 212 Sunnybrook; before: $200,820; after: $36,390;

25. Jeanie Inman, 216 Sunnybrook; before: $178,470; after: $25,040;

26. Robert Stasz, 224 Sunnybrook; before: $193,410;   after: $26,390;

Wherefore, Plaintiffs request:

A.    Judgment for each of the properties owned by the Plaintiffs:

1.  Kyle and Julie Campbell in the amount of $206,000;

2. Shana Severinsen in the amount of $210,000;

3. Joshua and Rachel Allen in the amount of $147,210;

4. David Peterson in the amount of $166,530;

5. Daniel and Kelly Messmore in the amount of $133,950;

6. Christopher and Kimberly Woods in the amount of $115,590;

7. William Bulfer in the amount of $169,140;

8. Shawn Miller in the amount of $121,610;

9. Martin and Tammi Lyons in the amount of $148,100;

10. Jason Cassidy in the amount of $165,900;

11. Helen Elliott in the amount of $184,260;

12. Brandon and Michele Beekman in the amount of $148,980;

13. William and Lee Ann Meyers in the amount of $153,110;

14. Michael and Kellie Beamer in the amount of $175,770;

15. David and Courtney Stenger in the amount of $169,910;

16. Myron Smith in the amount of $18,788;

17. Michael and Julie Sowers in the amount of $110,100;

18. David and Patti Boggs in the amount of $171,240;

19. Robert Cornelius, Jr in the amount of $171,270;

20. Tegist and Mark Leyew in the amount of $117,158;

21. Pamela and Harry Volk in the amount of $118,418;

22. Randy Rundle in the amount of $100,418;

23. Delbert and Julie Chilton in the amount of $185,596;

24. Robert Jorgensen in the amount of $164,430;

25. Jeanie Inman in the amount of $153,430;

26. Robert Stasz in the amount of $167,020.

B.      Interest at the lawful rate from the date of the taking, April 17, 2013, until  judgment is paid for each of the Plaintiffs;

C.      Punitive damages of $100,000 each of the following four property owners: Kyle and Julie Campbell, Shana Severinsen, Joshua and Rachel Allen, and David Peterson; and punitive damages of $25,000 for each of remaining property owners.

D.      Full recovery of costs and attorney's fees for each of the Plaintiffs;

E.      Such other and further relief as the court deems just and proper.

JURY TRIAL DEMANDED

## COUNT VI
### Indemnification Claim pursuant to 745 ILCS 10/9-102

The acts of the Defendants described in the above Counts were willful and wanton, and committed in the scope of employment.

Pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/9-102, the City is liable for any judgments for compensatory damages in this case arising from the actions of said Defendants.

WHEREFORE, Plaintiffs ask that this Court order the City to indemnify said Defendants for any judgment for compensatory damages in this case arising from their actions.

Dated:  September 18, 2014

Respectfully Submitted,

Joshua Allen e. al., Plaintiffs
By: /s/Carl F. Reardon
One of their attorneys

Carl F. Reardon
Attorney at Law (ARDC #2295725
120 Illini Drive
East Peoria, Il. 61611
Phone: (309) 699-6767
Fax: (309) 699-6774
Email: carlreardon@comcast.net

Louis J. Meyer
Meyer & Kiss, LLC
311 West Stratford Drive
Peoria, Illinois 61614
309.713.3751
louismeyer@meyerkiss.com

43

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2014, I electronically filed Plaintiffs' FIRST AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following registered CM/ECF participant(s):

Elisha ("Eli") S. Rosenblum
at: esrosenblum@okgc.com


By:    *s/Carl F. Reardon*

Carl F. Reardon
Attorney at Law ARDC #2295725
120 Illini Drive
East Peoria, Il. 61611
Phone: (309) 699-6767
Fax: (309) 699-6774
Email: carlreardon@comcast.net